J-A33011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICHARD MITCHELL | |
| Appellant | No. 2524 EDA 2013 |

Appeal from the Judgment of Sentence April 19, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002357-2012,
CP-51-CR-0002358-2012

BEFORE:  LAZARUS, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED JANUARY 30, 2015**

Richard Mitchell appeals from his judgment of sentence, imposed by the Court of Common Pleas of Philadelphia County, following his convictions for third-degree murder,[1] possession of an instrument of a crime (PIC),[2] carrying a firearm without a license,[3] providing false identification to law

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 907.

[3] 18 Pa.C.S. § 6106(a)(1).

enforcement,[4] and prohibited possession of a firearm.[5] Upon review, we affirm.

On September 10, 2011, at approximately 3:30 a.m., Mitchell shot and killed Shari Harris on the 3300 block of N. 13th Street. Mitchell shot Harris because she did not have the money she owed him for drugs. Police officers spoke with several witnesses who identified Mitchell as the shooter. The police ultimately apprehended Mitchell on September 21, 2011, after chasing him on foot.

On February 25, 2013, a jury convicted Mitchell of the aforementioned offenses, and on April 19, 2013, the court sentenced Mitchell to an aggregate term of 31½ to 63 years' imprisonment. The court denied Mitchell's post-sentence motion on August 27, 2013.

Thereafter, Mitchell filed a notice of appeal on August 29, 2013. On September 3, 2013, the court ordered Mitchell to file a Concise Statement of Errors Complained of on Appeal. Mitchell filed his statement on September 12, 2013.[6]

---

[4] 18 Pa.C.S. § 4914(a).

[5] 18 Pa.C.S. § 6105(a)(1).

[6] On November 18, 2013, Mitchell filed a petition before this Court, requesting a remand to the trial court based on newly discovered evidence. On December 10, 2013, we directed the trial court to determine whether an evidentiary hearing was warranted. On December 20, 2013, following counsel's argument on the petition, the trial court determined that an evidentiary hearing on newly discovered evidence was not warranted. This

*(Footnote Continued Next Page)*

On appeal, Mitchell presents the following issues for our review:

1. Did the Assistant District Attorney err in her closing speech, giving her personal opinion as to the credibility of a witness and the guilt of Mitchell, suggesting the defense had the burden to produce evidence, and unfairly criticizing and demeaning Mitchell's attorneys? Did this misconduct warrant a new trial?

2. Did Judge Byrd err in allowing testimony that Mitchell threatened his sister and brother-in-law with a gun on August 12, 2012, approximately one month before the September 10, 2011 crime at issue since this was a totally unrelated crime and the ballistic expert could not say this gun was used on September 10, 2011? Did this unrelated crime taint the jury?

3. Did Judge Byrd err in denying Mitchell's petition to remand on newly discovered evidence concerning the newly discovered misconduct of Homicide Detective Dove, particularly since Detective Dove did not have any written waivers of **Miranda**[7] rights?

4. Did Judge Byrd err in not suppressing Mitchell's unsigned statement since he contends Detective Dove never read him his **Miranda** rights and the statement is blank for the Miranda warnings, and does not contain the **Miranda** warning forms always used by the Philadelphia Homicide Detectives?  Was this a violation of Article 1, Section 9 of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments of the United States Constitution? Was there no knowing and voluntary waiver of **Miranda** rights?

Brief of Appellant, at 5-6.

_____

*(Footnote Continued)* ————————

Court subsequently issued an order permitting Mitchell to raise the claim and apply for relief in his appellate brief.

[7] **Miranda v. Arizona**, 384 U.S. 436 (1966).

We have reviewed the transcripts, briefs, the relevant law, and the well-reasoned opinion of the Honorable Sandy L.V. Byrd, and find that the opinion of the trial court thoroughly, comprehensively, and correctly disposes of Mitchell's first, second, and fourth issues on appeal. *See* Trial Court Opinion, 3/31/14, 32-36; 20-23; 25-29 (finding (1) no prosecutorial misconduct because comments were not improper or unduly prejudicial to Mitchell; (2) no error in allowing testimony of threat because it was used to establish access to and familiarity with handguns and to prove the identity of the perpetrator of the crime; and (3) waiver of *Miranda* rights was knowing and voluntary). We also find that Mitchell's third claim merits no relief.

In his third issue, Mitchell argues that Judge Byrd erred when he denied Mitchell's request for an evidentiary hearing on newly discovered evidence concerning Detective Dove's alleged misconduct. Our standard for awarding a new trial because of after-discovered evidence is well settled. The evidence: (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict. *See Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008) (citations omitted).

Here, at the hearing to determine whether an evidentiary hearing was proper, Mitchell's counsel acknowledged that his only knowledge of Detective Dove's alleged misconduct came from recent newspaper articles. N.T. Hearing, 12/20/13, at 7. Our Supreme Court recently held that newspaper

- 4 -

articles are merely hearsay reports and not an offer of proof because they are not evidence. ***Commonwealth v. Castro***, 93 A.3d 818 (Pa. 2014). Thus, in order to prevail on a motion for a new trial based on after-discovered evidence, the motion "must, at the very least, describe the evidence that will be presented at the hearing. Simply relying on conclusory accusations made by another, without more, is insufficient to warrant a hearing." ***Id***. at 827. Accordingly, we find ***Castro*** dispositive and discern no error by the trial court for denying Mitchell's request for an evidentiary hearing.

For the foregoing reasons, we affirm Mitchell's judgment of sentence. Counsel is directed to attach a copy of the trial court opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>1/30/2015</u>

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-51-CR-0002357-2012
    :     CP-51-CR-0002358-2012

**FILED** :

v.     SUPERIOR COURT

MAR 3 1 2014    :

RICHARD MITCHELL    Criminal Appeals Unit    2524 EDA 2013
First Judicial District of PA

OPINION

Byrd, J.                                  March 31, 2014

On February 25, 2013, a jury convicted defendant Richard Mitchell of third-degree murder and possession of an instrument of crime, at CP-51-CR-0002357-2012. The jury also convicted defendant of carrying a firearm without a license in violation of Section 6106 of the Uniform Firearms Act, providing false identification to law enforcement, and violating Section 6105 of the Uniform Firearms Act, at CP-51-CR-0002358-2012. On April 19, 2013, defendant was sentenced to an aggregate imprisonment term of thirty-one and one-half (31 ½) to sixty-three (63) years in prison.

After his post-sentence motion was denied on August 27, 2013, defendant filed a notice of appeal on August 29, 2013. On September 3, 2013, this court ordered defendant to file a Statement of Matters Complained of on Appeal. Defendant's Statement was filed on September 12, 2013. On November 18, 2013, defendant filed a petition before the Superior Court requesting a remand to this court based on newly discovered evidence. On December 10, 2013, the Superior Court directed this court to determine whether an evidentiary hearing was warranted.[1] On December 20, 2013, following counsel's argument on the petition, this court determined that an evidentiary hearing on newly discovered evidence was not warranted.

---

[1] A second identical order was issued on January 8, 2014 to incorporate defendant's second case docket number, which had been inadvertently omitted from the December 20, 2013 order.

*Commw. v. Richard Mitchell*          Page 1 of 39

## STATEMENT OF FACTS

On September 10, 2011, at approximately 3:30 a.m., defendant shot and killed Shari Harris on the 3300 block of 13th Street near the intersection of 13th Street and Rising Sun Boulevard. (N.T. 02/14/13, pp. 20-23, 27-28; N.T. 02/15/13, pp. 23-27). Ms. Harris was twenty-three (23) years old, five (5) feet and one (1) inch tall and one hundred and twenty-four (124) pounds. (N.T. 02/14/13, p. 164). Defendant approached her and asked about a large drug debt that she owed to him. (N.T. 02/15/13, pp. 23-24, 26-27). Ms. Harris told him that she did not have any money for him. (N.T. 02/15/13, pp. 23-24). Enraged with Ms. Harris's response, defendant put a gun to her head and fired. (N.T. 02/15/13, pp. 23-27). After one gunshot, Ms. Harris fell to the ground, landing on her side with her head halfway on the sidewalk and her body on the street between two vehicles. (N.T. 02/14/13, pp. 29, 64, 129-130). Defendant immediately fled the scene. (N.T. 02/14/13, pp. 27, 62-64; N.T. 02/15/13, pp. 23-24).

At 3:36 a.m., Ms. Harris was pronounced dead by paramedics who responded to 3340 North 13th Street in Philadelphia. (N.T. 02/14/13, p. 164). Dr. Sam Gulino, Chief Medical Examiner, conducted an autopsy of the victim and testified at trial as an expert in forensic pathology. (N.T. 02/14/13, pp. 157, 161, 163, 167). Dr. Gulino concluded to a reasonable degree of scientific and medical certainty that the cause of Ms. Harris's death was one through and through gunshot wound to her head. (N.T. 02/14/13, pp. 169-171, 175). The entrance wound was on Ms. Harris's left temple, about halfway between the corner of her eye and top of her ear. (N.T. 02/14/13, p. 173). The exit wound was on the right rear of Ms. Harris's head, above and behind the ear. (N.T. 02/14/13, p. 173). The bullet entered Ms. Harris's left temple, went through her skull, and exited the right rear of her scalp. (N.T. 02/14/13, pp. 167, 173). It struck the frontal and parietal lobes on the left side. (N.T. 02/14/13, pp. 169-170). It also struck some structures deep in the brain, including the thalamus, the midbrain, and the occipital lobe on the right side of the brain. (N.T. 02/14/13, pp. 169-171). A person with damage to this part of the brain dies very quickly, thus Ms. Harris would have been rendered unconscious immediately and collapsed to the ground. (N.T. 02/14/13, p. 171). Although a toxicology test detected cocaine and phencyclidine (PCP) in Ms. Harris's blood, those drugs did not contribute to her death. (N.T. 02/14/13, pp. 174-175, 178-179).

Dr. Gulino also concluded to a reasonable degree of scientific and medical certainty that the manner of Shari Harris's death was homicide. (N.T. 02/14/13, p. 175). He observed soot

and gunpowder around the entrance wound. (N.T. 02/14/13, p. 168). The soot and gunpowder had seared into Ms. Harris's skin, indicating that the muzzle of a gun was approximately 8 inches or less from the victim's skin when it was fired. (N.T. 02/14/13, pp. 168-169).

On Saturday, September 10, 2011, at approximately 3:35 a.m., Police Officer Robert Tavarez responded to 3300 North 13th Street. (N.T. 02/14/13, p. 129). When he arrived on the scene, he saw Ms. Harris lying on her side with her head halfway on the sidewalk and her body on the street between two vehicles. (N.T. 02/14/13, pp. 129-130). Officer Tavarez searched the area for ballistics evidence, but none was recovered. (N.T. 02/14/13, pp. 133-135, 206). He also searched for nearby video cameras in the area. (N.T. 02/14/13, p. 132). He found one facing the victim, but later discovered that it was not operational. (N.T. 02/14/13, p. 132).

Police officers found several witnesses who identified defendant as the shooter who fled the scene carrying a handgun. On the morning of September 10, 2011, Kevin Abraham arrived at 13th Street and Rising Sun Avenue while police officers were processing the scene. (N.T. 02/13/13, pp. 99-100, 102-103). After having a conversation with Anthony Baldwin, Mr. Abraham told police that Mr. Baldwin was an eyewitness and assisted them in finding him. (N.T. 02/13/13, p. 102). Mr. Abraham provided a statement to homicide detectives at 5:40 a.m. (N.T. 02/13/13, pp. 104-105).

Officer Tavarez transported Mr. Baldwin to the Homicide Unit at 5:05 a.m. on September 10, 2011. (N.T. 02/14/13, pp. 138-139, 152, 154). On September 11, 2011, at approximately 7:50 a.m., Detective James Pitts interviewed Anthony Baldwin, who did not appear to be under the influence of drugs or alcohol. (N.T. 02/14/13, pp. 57, 62). During the interview, Mr. Baldwin identified the victim from a photograph and informed police that he knew her from the neighborhood. (N.T. 02/14/13, p. 62). Mr. Baldwin signed this photograph after making the identification. (N.T. 02/14/13, pp. 67-68).

Mr. Baldwin told police that he was sitting on his friend's porch down the street when the shooting occurred. (N.T. 02/14/13, p. 62). After Mr. Baldwin heard a "pow", he saw the shooter run from behind a van with a gun in his hand, turn onto Rising Sun Avenue heading toward Germantown Avenue. (N.T. 02/14/13, pp. 62-63). Mr. Baldwin described the shooter as a brown-skinned man who appeared to be in his late 20s. (N.T. 02/14/13, pp. 63-64). The man was wearing a bright red Adidas track suit and either a hood or a hat on his head. (N.T. 02/14/13, p. 64). The man appeared to weigh more than him and was approximately 5 feet and 8

to 9 inches tall. (N.T. 02/14/13, pp. 63-64). After reviewing his statement, Mr. Baldwin signed it. (N.T. 02/14/13, pp. 66-67).

Detective Pitts showed Mr. Baldwin a photographic array that included eight photographs, one of which depicted defendant. (N.T. 02/14/13, p. 65). Mr. Baldwin stated that photograph number 5 looked familiar, but that the person was not the shooter. (N.T. 02/14/13, p. 66). Mr. Baldwin also stated that photograph number 3 looked like the shooter, but he was not sure. (N.T. 02/14/13, p. 66). Photograph number 3 displayed defendant. (N.T. 02/14/13, p. 66). Mr. Baldwin circled both of these photographs after making the identifications. (N.T. 02/14/13, p. 70).

During his interview, Mr. Baldwin informed police that an "old head fat smoker from around the way" picked up an unidentifiable item that defendant dropped as he fled the scene. (N.T. 02/14/13, p. 63). The "fat smoker" was identified as Lathan Peterson after Mr. Baldwin was shown a photograph. (N.T. 02/14/13, pp. 64, 73). Mr. Baldwin signed this photograph after making the identification. (N.T. 02/14/13, pp. 67-68). Mr. Baldwin stated that Mr. Peterson walked over to him and his friends and told them that he saw defendant fleeing the scene. (N.T. 02/14/13, p. 64). Mr. Baldwin stated that he then walked over to the victim's corpse, which was lying between two cars. (N.T. 02/14/13, p. 64).

On September 11, 2011, at 10:15 a.m., Detective James Burns interviewed Lathan Peterson, who was also known as Lathan Barfield. (N.T. 02/14/13, pp. 18-19). Barfield was the maiden name of Mr. Peterson's mother. (N.T. 02/14/13, p. 19). Mr. Peterson did not appear to be under the influence of alcohol or controlled substances during this interview. (N.T. 02/14/13, pp. 19-20). Mr. Peterson told Detective Burns that he knew the shooter and his family, but he did not know the shooter's name. (N.T. 02/14/13, p. 20). As a result, Detective Burns gave Mr. Peterson the opportunity to review a substantial number of photographs before he made an identification. (N.T. 02/14/13, pp. 21-22). When Mr. Peterson viewed a photograph of defendant, he stated: "[T]hat's him. This is the guy I'm talking about." (N.T. 02/14/13, p. 21). Detective Burns printed the photograph and attached it to Mr. Peterson's statement. (N.T. 02/14/13, pp. 21-22). Mr. Peterson wrote on the top of the photograph "Guy running from scene" and signed his name at the bottom. (N.T. 02/14/13, pp. 22-23). After Mr. Peterson made this identification, Detective Burns proceeded to take his written statement. (N.T. 02/14/13, p. 23). Detective Burns asked Mr. Peterson: "Lathan, a little earlier you went on our imager and

identified the person you saw dressed in the red shirt and red hat that was running from the scene and where the girl was shot and killed. Are you certain of that identification?" (N.T. 02/14/13, p. 23). Mr. Peterson answered in the affirmative without hesitation. (N.T. 02/14/13, pp. 23-24). Mr. Peterson signed his statement. (N.T. 02/14/13, pp. 52-53).

On September 15, 2011, at approximately 12:25 p.m., Detective Burns interviewed Nicole Porter. (N.T. 02/14/13, pp. 24-25). Ms. Porter was not under the influence of alcohol or controlled substances during this interview. (N.T. 02/14/13, p. 25). Ms. Porter stated that she was outside on her mother's porch with Mr. Baldwin and another male nicknamed "Leaf" before the shooting. (N.T. 02/14/13, pp. 27-28). Her daughter, Cashae Porter, was inside the house. (N.T. 02/14/13, p. 27). The shooting occurred while she was across the street from her mother's house talking to an unidentified male. (N.T. 02/14/13, p. 27). Ms. Porter heard a "pow" and then saw a man run on 13th Street and turn onto Rising Sun Avenue. (N.T. 02/14/13, p. 27). Ms. Porter described the man as having "black, brown skin" and being about her height, which is 5 feet and 6 inches. (N.T. 02/14/13, p. 28). The man was wearing a red shirt and a hat. (N.T. 02/14/13, p. 28). Although she did not get a good look at the man, she thought that his hat was red also. (N.T. 02/14/13, p. 28).

A couple of minutes after the shooting, Mr. Peterson came down the street and told her that the man had killed the victim. (N.T. 02/14/13, p. 28). Another man who lived on Rising Sun Avenue informed Ms. Porter that the shooter ran up to Mr. Peterson and told him something about the shooting. (N.T. 02/14/13, pp. 28-29). Based on this information, Ms. Porter thought that Mr. Peterson saw the shooter. (N.T. 02/14/13, p. 28).

Ms. Porter also stated that she and Mr. Baldwin walked over to the victim's body and saw her lying on the ground in between two parked cars. (N.T. 02/14/13, p. 29). Ms. Porter identified the victim after being shown a photograph. (N.T. 02/14/13, pp. 29-30). This photograph was included in Ms. Porter's written statement, which she signed. (N.T. 02/14/13, pp. 29-31).

On September 20, 2011, Police Officers Diaz and Hernandez were assigned to work the burglary detail as plain clothed officers. (N.T. 02/15/13, pp. 69-71). At approximately 11:52 p.m., they were directed to investigate an anonymous tip that a suspect described as a black male wearing a red hat, black jacket, and Timberland boots was at the intersection of Germantown Avenue and Tioga Street. (N.T. 02/15/13, pp. 71-72). Within two minutes, they responded to

that area in search of the suspect. (N.T. 02/15/13, pp. 71-73). As they were travelling southbound on the 3400 block of Germantown Avenue, Officer Diaz observed defendant, who matched the description that had been provided over police radio. (N.T. 02/15/13, p. 74). Defendant was walking northbound with an unidentified female. (N.T. 02/15/13, p. 73).

Because they were directed to a specific location, Officers Diaz and Hernandez continued onto the intersection of Germantown Avenue and Tioga Street. (N.T. 02/15/13, p. 74). They saw no one who matched the police radio description at that intersection. (N.T. 02/15/13, p. 74). As a result, they made a U-turn and began travelling northbound toward the same direction that defendant was walking. (N.T. 02/15/13, p. 74). Defendant then turned left on Venango Street and was walking westbound toward Broad Street. (N.T. 02/15/13, p. 75). When Officers Diaz and Hernandez reached defendant, their unmarked vehicle was almost parallel to him. (N.T. 02/15/13, p. 75). Officers Diaz and Hernandez turned on the siren and exited their vehicle. (N.T. 02/15/13, pp. 70, 75-76). When they approached defendant, they identified themselves as police officers and asked if they could talk to him. (N.T. 02/15/13, pp. 75-76). Before they could say anything else, defendant grabbed the right side of his waistband and began to run westbound. (N.T. 02/15/13, pp. 75, 77-78).

Officer Diaz then pursued defendant on foot. (N.T. 02/15/13, pp. 76-77). Based on his experience and training, Officer Diaz recognized defendant's action as an indicator that he was in possession of a handgun. (N.T. 02/15/13, pp. 76-77). Officer Diaz found defendant in an alley near the 1400 block of Pacific Avenue, where he was discarding his coat and hat and reaching for his waistband. (N.T. 02/15/13, p. 78). Officer Diaz continued his pursuit and toppled defendant at the end of the alley. (N.T. 02/15/13, p. 78). Officer Diaz and defendant fell into a fence, which opened onto Pacific Avenue. (N.T. 02/15/13, pp. 98-99). As the fence opened, defendant's gun was dislodged, flew into the air and landed on the ground. (N.T. 02/15/13, pp. 78, 84-85). Defendant continued his attempt to flee. (N.T. 02/15/13, pp. 78-79). As a result, Officer Diaz struck defendant once in the leg with his baton. (N.T. 02/15/13, pp. 78-79). At that time, Officer Hernandez arrived and assisted with defendant's arrest, which occurred at 12:30 a.m. on September 21, 2011. (N.T. 02/15/13, pp. 78-79, 89-90, 102).[2]

---

[2] At that time, there was an outstanding arrest warrant for defendant that had been issued on August 17, 2011 for another incident. (N.T. 02/11/14, pp. 289-290).

*Commw. v. Richard Mitchell*                    Page 6 of 39

At the time of his arrest, defendant told Officer Hernandez that his name was Donte Dawson and that his birthday was January 14, 1979. (N.T. 02/15/13, pp. 90, 104-105). Defendant also stated that he was five feet and eight inches tall and that he weighed 165 pounds. (N.T. 02/15/13, p. 105). He further stated that his address was 2522 Bouvier Street. (N.T. 02/15/13, pp. 90-91, 106). As a result, Officer Hernandez processed defendant's arrest under the name Donte Dawson. (N.T. 02/15/13, p. 92). This procedure included an immediate record check which revealed defendant's true identity, and that he had used the name and date of birth of his older brother when arrested. (N.T. 02/15/13, p. 112). Donte Dawson died on October 1, 1998. (N.T. 02/15/13, p. 112). At the time of his death, Donte Dawson was nicknamed "Black" and lived at 1721 West Pacific Street in Philadelphia. (N.T. 02/15/13, p. 112).

Immediately after his arrest, Officer Diaz retrieved defendant's gun and his discarded clothing from the alleyway. (N.T. 02/15/13, pp. 84, 87). Defendant's clothing included a black wool navy coat and a red hat with a New Jersey Devil logo and a black brim. (N.T. 02/15/13, p. 84). Officer Diaz also recovered the gun that fell from defendant's person during his flight from the officers. (N.T. 02/15/13, p. 84). The gun was a dark gray/bronze .38 caliber Colt handgun with a handle wrapped in electrical tape. (N.T. 02/15/13, p. 86). Officer Diaz quickly recovered this gun to insure that no one else could grab it. (N.T. 02/15/13, p. 87). Because he had difficulty opening the cylinder, he requested the SWAT Unit's assistance. (N.T. 02/15/13, p. 88). The SWAT Unit arrived and opened the cylinder for Officer Diaz, who retrieved one 9 millimeter fired cartridge casing and three live 9 millimeter cartridges from inside the gun. (N.T. 02/15/13, pp. 86, 88-89). This ballistics evidence was later submitted to the Firearms Unit.

On November 20, 2011, Police Officer Clyde Frasier received the .38 Colt revolver from the Firearms Unit. (N.T. 02/14/13, p. 226). He visually examined and tested the gun for fingerprints. (N.T. 02/14/13, pp. 221-224). No fingerprints were found. (N.T. 02/14/13, p. 224). Officer Frasier prepared a report and returned the gun to the Firearms Identification Unit. (N.T. 02/14/13, pp. 222, 226-227).

On April 16, 2012, Police Officer Raymond Andrejczak examined the .38 Colt revolver, one 9 millimeter Luger fired cartridge casing, and three 9 millimeter Luger cartridges and prepared a report. (N.T. 02/14/13, pp. 198, 200-203, 214-215). While conducting a visual examination of the firearm, Officer Andrejczak found gunshot residue, which indicated that it

had been fired previously. (N.T. 02/14/13, p. 201). Officer Andrejczak offered the foregoing at trial where he testified as an expert witness. (N.T. 02/14/13, pp. 190-192).

Officer Andrejczak concluded to a reasonable degree of scientific certainty that the 9 millimeter Luger cartridges could fit into the revolver even though they were not the proper cartridges for that firearm. (N.T. 02/14/13, p. 202). He stated that it was not uncommon for him to examine weapons loaded with the wrong ammunition. (N.T. 02/14/13, p. 202). He further testified that although it is more typical for a semi-automatic firearm to have 9 millimeter Luger ammunition, there are revolvers that are chambered similar to a 9 millimeter Luger. (N.T. 02/14/13, pp. 201-202). Those revolvers require the use of a special moon clip, which is a small metal ring that holds the cartridges in the cylinder. (N.T. 02/14/13, p. 202). Officer Andrejczak test-fired the firearm with the correct ammunition. (N.T. 02/14/13, p. 203). He then test-fired the firearm with a 9 millimeter Luger primed case to see if it would fire without exploding, and he found that it was operable. (N.T. 02/14/13, pp. 203-204). For analysis, Officer Andrejczak created a 9 millimeter Luger fired cartridge casing and a .38 Smith and Wesson fired cartridge casing. (N.T. 02/14/13, p. 204). He compared the microscopic markings of those two fired cartridge casings to the microscopic markings of the one 9 millimeter Luger fired cartridge casing that was submitted. (N.T. 02/14/13, p. 204). After making this comparison, Officer Andrejczak concluded to a reasonable degree of scientific certainty that the 9 millimeter Luger fired cartridge casing was fired from the .38 Colt revolver. (N.T. 02/14/13, pp. 204-205).

Officer Andrejczak explained the difference between a semi-automatic firearm, an automatic firearm, and a revolver. (N.T. 02/14/13, p. 197). A semi-automatic firearm will automatically eject a fired cartridge casing and then be prepared to fire another live cartridge. (N.T. 02/14/13, p. 197). An automatic firearm will continuously fire until the person stops or the ammunition has been exhausted. (N.T. 02/14/13, p. 197). A properly operating revolver does not automatically eject a fired cartridge casing. (N.T. 02/14/13, p. 198). The fired cartridge casing stays inside the cylinder until it is manually removed. (N.T. 02/14/13, pp. 197-198). Officer Andrejczak concluded to a reasonable degree of scientific certainty that the lack of fired cartridge casings recovered at the crime scene is consistent with the use of a revolver. (N.T. 02/14/13, pp. 206-207).

Officer Andrejczak conducted a trigger pull test to determine how much pressure was needed to pull the trigger of the submitted firearm. (N.T. 02/14/13, pp. 207-208). He concluded

to a reasonable degree of scientific certainty that it took 5 pounds of pressure to fire the revolver in single action, which is a short pull of the trigger when the hammer is cocked. (N.T. 02/14/13, pp. 208-210). He also concluded to a reasonable degree of scientific certainty that it took 10 pounds to fire the revolver in double action, which is a long continuous pull of the trigger. (N.T. 02/14/13, pp. 208-210). Officer Andrejczak noted that most revolvers fire within the range of 5 to 10 pounds unless they have been modified. (N.T. 02/14/13, pp. 208-210, 216-217). He also explained that the velocity of a firearm can differ because it is based on the brand of ammunition and the weight of the bullet. (N.T. 02/14/13, p. 206). The average velocity for a 9 millimeter Luger cartridge was approximately 1,050 to 1,100 feet per second. (N.T. 02/14/13, p. 205). The average velocity for a .38 Smith and Wesson cartridge was approximately 700 feet per second. (N.T. 02/14/13, pp. 205-206). Officer Andrejczak noted that the submitted firearm was loaded with ammunition that gave it a greater velocity than it would have had otherwise. (N.T. 02/14/13, p. 206). Officer Andrejczak concluded to a reasonable degree of scientific certainty that the 9 millimeter ammunition could cause a perforating gunshot wound or a through and through gunshot wound if it is within close proximity to a person. (N.T. 02/14/13, pp. 206, 210).

At trial, Michael Rigney testified about a prior incident where he observed defendant in possession of a gun. (N.T. 02/13/13, p. 21). On August 12, 2011, Mr. Rigney lived with his ex-girlfriend Sondra Mitchell, who is defendant's sister. (N.T. 02/13/13, pp. 20-21, 26). He also lived with defendant, Sondra's sister, and Sondra's cousin. (N.T. 02/13/13, p. 20). On that day, at 5:00 a.m., Mr. Rigney saw defendant and Sondra's cousin in his bedroom. (N.T. 02/13/13, p. 21). Defendant was holding a long, black revolver with black tape. (N.T. 02/13/13, pp. 21-22). During his testimony, Mr. Rigney identified the gun that Officer Diaz recovered from defendant as an identical match to the gun he saw on August 12, 2011. (N.T. 02/13/13, p. 25; 02/14/13, p. 194; 02/15/13, pp. 86-87).

At trial, the parties stipulated that defendant was not licensed to carry a firearm. (N.T. 02/15/13, pp. 113-114).

Detective Ron Dove was the assigned investigator of this homicide. (N.T. 02/15/13, p. 11). Detective Dove first encountered defendant on September 21, 2011, at around 5:00 a.m. (N.T. 02/15/13, p. 13). After resolving the discrepancy of defendant's identity, Detective Dove advised defendant of his Miranda rights. (N.T. 02/15/13, p. 14). When Detective Dove asked defendant if he understood the warnings, defendant answered in the affirmative. (N.T. 02/15/13,

pp. 14-15). After being provided his Miranda warnings, defendant was cooperative and began to talk to Detective Dove. (N.T. 02/15/13, p. 15).

Before taking defendant's written statement, Detective Dove read defendant his Miranda warnings a second time. (N.T. 02/15/13, p. 16). Defendant was then presented with a form to memorialize that he understood his Miranda rights and that he declined the opportunity to invoke same. (N.T. 02/15/13, p. 16). After defendant read the content of this form, Detective Dove asked defendant whether he understood the form. (N.T. 02/15/13, pp. 17-18). Detective Dove also asked defendant if he wished to continue talking or if he wished to invoke his right to remain silent or to have a lawyer present. (N.T. 02/15/13, pp. 17-18). Defendant indicated that he did not wish to invoke his rights. (N.T. 02/15/13, p. 18). Defendant then signed the bottom of the form in Detective Dove's presence. (N.T. 02/15/13, p. 19).

Thereafter, at 6:35 a.m., Detective Dove interviewed defendant. (N.T. 02/15/13, pp. 20-21). Defendant was not under the influence of alcohol or drugs at that time. (N.T. 02/15/13, p. 23). At the beginning of the interview, defendant confirmed that he had been advised of his Miranda rights. (N.T. 02/15/13, p. 23). Defendant also indicated that he understood everything that Detective Dove had reviewed with him. (N.T. 02/15/13, p. 23). He further understood that he was arrested for the murder of Shari Harris. (N.T. 02/15/13, p. 23). Defendant indicated that he wanted to make a statement. (N.T. 02/15/13, pp. 23-24).

Defendant gave a statement, wherein he admitted to killing the victim. (N.T. 02/15/13, pp. 23-24). Defendant informed Detective Dove that he was upset with the victim because she owed him approximately $3000 for cocaine that he had provided to her over the course of a couple of months. (N.T. 02/15/13, pp. 23-24, 26-27). Defendant told Detective Dove that he asked the victim for his money and she told him that she did not have any money for him. (N.T. 02/15/13, pp. 23-24). Defendant stated: "She was all disrespectful, like saying she don't have shit for me and that is when I got pissed and put the gun to her head. I was putting it right up against her head to scare her and it went off. She dropped right there and I ran away. I didn't mean to shoot. I was scared." (N.T. 02/15/13, pp. 23-24).

When Detective Fetters showed defendant a photograph of the victim, defendant stated: "[Y]eah, that's Me-Me, that's the girl I shot." (N.T. 02/15/13, pp. 25-26). Defendant denied taking anything from the victim after he shot her. (N.T. 02/15/13, p. 27). However, he admitted to using the same gun that he possessed on the night that he was arrested. (N.T. 02/15/13, p. 27).

Defendant stated that he did not remember what he was wearing that particular night, but that he usually wears sweatpants and a baseball hat. (N.T. 02/15/13, p. 27).

At the end of the interview, Detective Fetters read back the statement to defendant. (N.T. 02/15/13, p. 28). Defendant then responded, "I heard everything he read back to me and that's what I told you today but I ain't signing anymore without my lawyer." (N.T. 02/15/13, pp. 28-29). At that point, Detective Dove stopped asking defendant questions. (N.T. 02/15/13, p. 29). Following defendant's statement, he was charged with the above-stated crimes. (N.T. 02/15/13, pp. 29-30).

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Defendant raised the following issues in his Statement of Matters Complained of on Appeal, in accordance with Pennsylvania Rule of Appellate Procedure 1925(b):[3]

1. The Defendant, Richard Mitchell, was found guilty of two counts of murder of the third degree and one count of possessing an instrument of crime on bill of information 2357-2012 and on bill of information 2358-2012, Mr. Mitchell was found guilty of possessing a firearm, false information to law enforcement and a convict possessing a gun.

2. Mr. Mitchell was sentenced to 20 to 40 years of incarceration on the murder charge and a consecutive 2 ½ to 5 years of incarceration on the charge of possessing an instrument of crime. On the charge of a convict possessing a gun, Mr. Mitchell was sentenced to a consecutive 5 to 10 years, plus a consecutive 3 ½ to 7 year sentence on carrying a firearm without a license, plus 6 to 12 years on the charge of false information to law authorities, to be consecutive.

3. The Defendant contends the verdict was against the weight of the evidence. He contends there was conflicting testimony. The Commonwealth witnesses were contradictory. The Defendant presented an alibi defense. The main Commonwealth witness, Lathan Barfield, was drunk and did not make a statement immediately after. The witness, Darnell Flowers, was uncertain as to the identification. There was no corroborating evidence in that the gun that was later found did not match the bullets or shell casings that were found. No contraband

---

[3] The following is a verbatim account of defendant's Statement.

*Commw. v. Richard Mitchell*                    Page 11 of 39

or anything was found on Mr. Mitchell's physical person. No blood splatter was found on any clothing. There was no physical evidence connecting the Defendant. The Defendant contends the verdict was based on speculation and guess work and should be reversed.

4.     The Defendant contends the verdict was against the weight of the evidence. The Defendant would incorporate by reference a brief summary of the evidence in the sufficiency of evidence argument. He contends that this verdict should shock the conscience of the fact finder.

5.     The Defendant, Richard Mitchell, contends the trial judge erred in allowing evidence of him threatening his sister and brother and law [sic] with a gun on August 12, 2011, approximately one month before the alleged crime on September 10, 2011. The Court allowed the sister and brother in law to say they were threatened by the gun. The brother in law supposedly identified the gun that was taken on September 20, 2011 at the time the Defendant was being arrested, as being the same gun. But in an earlier statement, he was not able to say it was the same gun. The introduction of his prior assault and robbery against his sister and brother in law a month before was clearly error and tainted the jury and denied Mr. Mitchell his right to due process and a fair trial. This tainted the jury with unrelated, bad conduct.

6.     The Defendant, Richard Mitchell, contends that the Court erred in not severing the case where he was arrested with a gun on September 20, 2012 by the police. Although the gun was a revolver, there was no connection of that gun to the crime itself. Having the jury hear that the Defendant was arrested ten days after the alleged murder for an unrelated crime with a gun tainted the jury with unrelated, bad conduct. A new trial is warranted.

7.     The trial judge erred in allowing a gruesome picture of the decedent, which was in color and bloody (Commonwealth's Exhibit C-12), to be introduced at the trial and shown on a big screen to the jury repeatedly during the trial. The said picture denied the Defendant his right to due process and a fair trial and was very inflammatory.

8.     The Defendant contends he should be granted a new trial and arrest of judgment since Judge Byrd erred in not suppressing his statement. The Defendant contends his statement is a violation of his Fifth and Fourteenth Amendment rights in the

United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. The Defendant contends there was no valid waiver of Miranda rights. The police officers did not have the normal and required Miranda waiver forms signed. There was nothing that indicated Mr. Mitchell validly waived his rights at any time. The questions and answers in the statement requiring the answers to the Miranda waivers was blank. The Defendant contends his statement should not have been admitted into evidence and a new trial is warranted since he was not properly warned of his Miranda rights and, therefore, the statement was invalid and should be suppressed. Further, he did not knowingly, voluntarily and intelligently waive his Miranda rights.

9.     The Defendant contends that the stop and search and seizure of the gun from him on September 20, 2012 was without probable cause or reasonable suspicion and a violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. The stop was ten days after the murder. The Defendant was walking on the street with his girlfriend when the police approached him and tried to seize him. Mr. Mitchell ran and was chased and then ultimately arrested and the gun was recovered. Mr. Mitchell contends that the stopping and seizing of him was an improper search and seizure and arrest and in violation of the above constitutional provisions.

10.     The Defendant contends that the prosecutor erred in her closing speech to the jury. The District Attorney made several statements of personal opinion, including a personal statement that the truth was that the defendant was guilty. He contends the District Attorney made improper statements criticizing his defense counsel and suggested the defense had certain burdens of proof. The District Attorney improperly indicated that the defense had the purpose of degrading the victim. The District Attorney made those and other inflammatory statements. The District Attorney also made statements about the Defendant's family outside and that was improper. The Defendant requests that a new trial be granted. The statements are as follows:

a.)     "Ms. Kim:     So when counsel talks to you over and over again about a condom in her, first of all, it was preserved. If the Defense wanted to test it, it is available for anyone to test it.

Mr. Stretton: Objection.

The Court: Sustained." (2/19 N.T. 133).

This statement improperly placed the burden on the defense.

b.) "Ms. Kirn: She is a young lady who, as you heard, had a lot of drugs in her system. So is it possible that she didn't know that was in her? Of course. Does it have anything to do with her death? No. That's just a disgusting detail to, again, try to besmirch or smear this young woman who didn't do anything wrong.

Mr. Stretton: Objection, move for a mistrial.

The Court: Denied." (2/19 N.T. 134).

This statement wrongly criticized for valid cross examination of the defense.

c.) "Ms. Kirn: ...Verdict means to speak the truth and so I beg you speak the truth on behalf of Shari Harris, on behalf of Philadelphia and the truth is that the Defendant is guilty.

Mr. Stretton: Objection. Move for a mistrial.

The Court: Overruled. Denied." (2/19 N.T. 175).

This statement is improper and almost asks to send a message.

11. The Defendant contends the trial judge erred in not giving the following instructions as quoted by Mr. Stretton:

a.) "Mr. Stretton: I have one objection. On your instruction on the Defendant's prior drug use, remember that arose during Mr. Peterson's testimony, the statement about him grinding and what that means, that was to be introduced primarily for his opportunity -- how he knew the Defendant. In your instruction though, you noted that it went to the motive and other matters. That

*Commw. v. Richard Mitchell*        Page 14 of 39

was different from your instructions you had given to the jury earlier." (2/19 N.T. 227).

## DISCUSSION

Defendant's first and second claims challenge the sufficiency and the weight of the evidence. In evaluating whether the evidence was sufficient to sustain a conviction, the appellate court "must view the evidence in the light most favorable to the Commonwealth as verdict winner, accept as true all the evidence and all reasonable inferences upon which, if believed, the jury could properly have based its verdict, and determine whether such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Tate*, 485 Pa. 180, 182, 401 A.2d 353, 354 (1979). In applying this test, "the entire record must be evaluated and all evidence actually received must be considered." *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001) (quoting *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000)). In *Commonwealth v. Costa-Hernandez*, 802 A.2d 671, 675 (Pa. Super. 2002), the court recognized that the "question of any doubt regarding the facts and circumstances established by the Commonwealth is for the fact-finder to resolve unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." The appellate court may not weigh the evidence and substitute its judgment for the fact-finder. *Commonwealth v. Taylor*, 831 A.2d 661 (Pa. Super. 2003). Further, "it is for the fact finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony." *Commonwealth v. Mack*, 850 A.2d 690, 693 (Pa. Super. 2004). In *Commonwealth v. Geiger*, 475 Pa. 249, 254, 380 A.2d 338, 340 (1977), the court held that "[t]he Commonwealth must indeed prove every element of a crime beyond a reasonable doubt in order to sustain a valid conviction for that crime." The Commonwealth may meet this burden by presenting "wholly circumstantial evidence." *Commonwealth v. Williams*, 615 A.2d 416, 418 (Pa. Super. 1992).

In the instant matter, defendant was convicted of third-degree murder and possession of an instrument of crime, at CP-51-CR-0002357-2012. First, there was sufficient evidence to support defendant's third-degree murder conviction. In *Commonwealth v. Kling*, 731 A.2d 145, 147 (Pa. Super. 1999), the court explained that "[t]hird degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice." *See also* 18 Pa. C.S. §2502(c) (stating that "[a]ll other kinds of

murder shall be murder of the third degree"); *Commonwealth v. Carter*, 481 Pa. 495, 498-499, 393 A.2d 13, 15 (1978) (defining third-degree murder as "an unlawful killing with malice expressed or implied, but absent any specific intent to take a life"). Malice "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Ludwig*, 583 Pa. 6, 21, 874 A.2d 623, 632 (2005) (quoting *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)). It "may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator 'consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.' " *Commonwealth v. Young*, 494 Pa. 224, 228, 431 A.2d 230, 232 (1981) (quoting *Commonwealth v. Hare*, 486 Pa. 123, 129, 404 A.2d 388, 391 (1979)). The existence of "malice may be inferred from all the circumstances surrounding the conduct of the accused." *Commonwealth v. Mercado*, 649 A.2d 946, 955 (Pa. Super. 1994). *See also Commonwealth v. Thomas*, 656 A.2d 514, 516 (Pa. Super. 1995) (explaining that "all facts, including those before, during, and after the event, must be considered" when determining whether a third-degree murder conviction should be upheld).

As stated above, there was sufficient evidence that an unlawful and malicious killing occurred. After confronting Ms. Harris about a large drug debt, defendant held a gun in his hand and pointed it within close range to her head. By engaging in such conduct, defendant consciously disregarded an unjustified and extremely high risk that the gun would fire and kill the victim. Ms. Harris's death resulted from defendant's unlawful and malicious conduct. After the gun fired once, Ms. Harris fell to the ground and was left lying there until rescue arrived. The bullet entered her left temple, went through her skull, and exited the right rear of her scalp. As a result, the victim suffered significant and irreparable damage to her brain. At trial, the chief medical examiner concluded to a reasonable degree of medical certainty that the cause of Ms. Harris's death was one through and through gunshot wound to her head. *See Commonwealth v. Manchas*, 633 A.2d 618, 623 (Pa. Super. 1993) (reiterating principle that "the inference [arising] from the use of a deadly weapon upon a vital part of the body alone is sufficient to establish malice"). The chief medical examiner further concluded to a reasonable degree of medical certainty that the manner of Ms. Harris's death was by homicide. These facts certainly show that malice was present.

Furthermore, evidence of defendant's flight from the crime scene and from police prior to his arrest, and his false identification to law enforcement is evidence of consciousness of guilt and constitutes additional support that he was guilty of the crimes charged. *See Commonwealth v. Paddy*, 569 Pa. 47, 92, 800 A.2d 294, 322 (2002) (reiterating that "when a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred"). Thus, the Commonwealth proved beyond a reasonable doubt that defendant was guilty of third-degree murder.

Defendant was also convicted of possession of an instrument of crime. A defendant is guilty of this offense when he "possesses any instrument of crime with intent to employ it criminally." 18 Pa. C.S. §907(a). An instrument of crime is "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa. C.S. §907(d). Here, the facts clearly demonstrate that defendant possessed a gun with the intent to use it in a criminal manner. *See Commonwealth v. Stokes*, 38 A.3d 846, 854 (Pa. Super. 2011) (holding that "[i]t is undisputed that a gun can be an instrument of crime"). Although police did not recover a handgun at the crime scene, there were eyewitnesses who testified that they saw defendant flee the scene of the shooting with a gun in his hand.

The Commonwealth also presented evidence that police officers recovered a gun from defendant immediately after his arrest. This evidence established that defendant had ready access to a weapon. At trial, Officer Andrejczak, an expert in firearms identification, testified that he concluded to a reasonable degree of scientific certainty that the gun had been used previously due to the presence of gunshot residue. Officer Andrejczak further concluded to a reasonable degree of scientific certainty that it was likely that a revolver was used in this murder given the absence of fired cartridge casings at the crime scene. This evidence showed that defendant possessed and used a weapon at the time of the shooting. *See Commonwealth v. McKeithan*, 504 A.2d 294, 299 (Pa. Super. 1986) (noting that "[a] person may be convicted on the basis of circumstantial evidence alone if reasonable inferences arising therefrom prove the fact in question beyond a reasonable doubt").

In addition to being convicted of third-degree murder and possession of an instrument of crime, defendant was found guilty of providing false identification to law enforcement, carrying a

firearm without a license in violation of Section 6106 of the Uniform Firearms Act, and possessing a firearm as a convicted felon in violation of Section 6105 of the Uniform Firearms Act, at CP-51-CR-0002358-2012. An individual is guilty of providing false identification to law enforcement "if he furnishes law enforcement authorities with false information about his identity after being informed by a law enforcement officer who is in uniform or who has identified himself as a law enforcement officer that the person is the subject of an official investigation of a violation of law." 18 Pa. C.S. §4914. The evidence shows that defendant is guilty of committing this offense. After his arrest, defendant identified himself to police officers as Donte Dawson and told them that his date of birth was January 14, 1979. He provided this same information when he was transported to the police station. As a result, defendant's arrest was processed under that name. Police officers subsequently discovered defendant's true identity and learned that he had provided them with the name and date of birth of his deceased brother. Based on these facts, there was sufficient evidence to convict defendant of providing false identification to law enforcement.

Defendant was also found guilty of violating Section 6106 of the Uniform Firearms Act and Section 6105 of the Uniform Firearms Act. Pursuant to Section 6106(a)(1) of the Uniform Firearms Act, a person is guilty of carrying a firearm without a license if he "carries a firearm in any vehicle or ... carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license...." 18 Pa. C.S. §6106(a)(1). Here, the evidence shows that defendant was carrying a firearm without a license in violation of Section 6106 of the Uniform Firearms Act. At trial, the parties stipulated that defendant was not licensed to carry a firearm. Notwithstanding this fact, defendant was found in possession of a dark gray/bronze .38 caliber Colt revolver with a handle wrapped in electrical tape at the time of his arrest. The gun had one 9 millimeter fired cartridge casing and three live 9 milllimeter cartridges inside the cylinder. In light of these facts, there was sufficient evidence for the jury to conclude that defendant was guilty of violating Section 6106 of the Uniform Firearms Act.

After the jury entered its verdict, this court conducted a waiver trial and found defendant guilty of violating Section 6105 of the Uniform Firearms Act. At the outset, this court did not err in conducting a separate proceeding for this charge. *See Commonwealth v. Brown*, 323 A.2d 223, 224 (Pa. Super. 1974) (ruling that "[t]he grant or denial of severance is a matter of the discretion of the trial court whose conclusion will be reversed only for manifest abuse of discretion or

prejudice or clear injustice to the defendant"). Moreover, this court did not err in finding defendant guilty of violating Section 6105 of the Uniform Firearms Act, which prohibits an individual convicted of any enumerated offense from possessing a firearm.

To be convicted under Section 6105, the Commonwealth "must only prove that Appellant was convicted of an enumerated offense." *Commonwealth v. Williams*, 920 A.2d 887, 891 (Pa. Super. 2007). Here, counsel stipulated that defendant was previously convicted of conspiracy to commit murder (first-degree felony), which is an enumerated offense in Section 6105. As a result of this conviction, defendant was not permitted to possess a firearm. In light of the jury's verdict finding defendant in possession of a handgun, this court did not err in finding defendant guilty of violating Section 6105. Furthermore, there is no basis for defendant's contention that there was insufficient evidence for his other convictions because the elements of each crime were established beyond a reasonable doubt. Therefore, the evidence was sufficient to support defendant's convictions.

Defendant also claims that the verdict is against the weight of the evidence. A new trial will be granted on this basis "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. VanDivner*, 599 Pa. 617, 630, 962 A.2d 1170, 1177 (2009). The trial court "cannot grant a new trial merely because of some conflict in testimony or because the judge would reach a different conclusion on the same facts, but should only do so in extraordinary circumstances[.]" *Commonwealth v. Blakeney*, 596 Pa. 510, 523, 946 A.2d 645, 653 (2008). Indeed, "[t]he factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Diggs*, 597 Pa. 28, 39, 949 A.2d 873, 879 (2008). In reviewing whether the verdict was against the weight of the evidence, the trial court must exercise its discretion in determining whether " 'certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000) (quoting *Thompson v. Philadelphia*, 507 Pa. 592, 601, 493 A.2d 669, 674 (1985)). The appellate court's review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Diggs*, 597 Pa. at 39, 949 A.2d at 879. As the above analysis demonstrates, the verdict in this case was not against the weight of the evidence. *See Commonwealth v. Murray*, 597 A.2d 111, 112 (Pa. Super. 1991) (recognizing "that in many instances challenges to the

weight of the evidence are in reality, attacks on the sufficiency of the evidence"). Thus, defendant's claim has no basis.

Defendant contends that this court erred in admitting evidence of the August 12, 2011 incident, wherein he allegedly threatened his sister and his sister's boyfriend with a gun and robbed them. Defendant claims that the introduction of this prior assault and robbery tainted the jury with unrelated prior bad conduct. There is no merit to defendant's claim. First, it is important to note that the Commonwealth did not elicit testimony regarding a prior assault and robbery.[4] At trial, Mr. Rigney's testimony focused on defendant's prior possession of a handgun. Mr. Rigney testified that he saw defendant with a long, black revolver on August 12, 2011, at approximately 5:00 a.m. Mr. Rigney also identified the gun that defendant possessed on September 10, 2011 as an identical match to the gun that he saw in defendant's possession on August 12, 2011. Aside from briefly mentioning that defendant pointed a gun at him, Mr. Rigney did not disclose the assault or robbery that defendant allegedly perpetrated against him or defendant's sister. Consequently, the jury was only made aware of defendant's prior possession of a handgun.

This court did not err in admitting evidence regarding defendant's prior possession of a handgun. It is well settled "that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." *Commonwealth v. Rivera*, 603 Pa. 340, 368, 983 A.2d 1211, 1228 (2009). An evidentiary ruling "will not be disturbed on appeal 'unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'" *Commonwealth v. Minich*, 4 A.3d 1063, 1068 (Pa. Super. 2010) (quoting *Commonwealth v. Owens*, 929 A.2d 1187, 1190 (Pa. Super. 2007)). Indeed, "[e]vidence of other crimes, wrongs, or

---

[4] Prior to introducing this witness, the prosecutor provided the following offer of proof:

> [THE COURT]: Give me your offer of proof on Mr. Rigney, please.
>
> [Assistant District Attorney]: Your Honor, if I may, Michael Rigney will testify in accordance with this Court's earlier ruling that on August 12, 2011 at approximately 5:00 a.m., he had the opportunity to see the Defendant in his bedroom. He saw the Defendant with a gun. He had an opportunity to view the gun at close proximity. In fact, he will not only describe the gun, I believe he will identify the gun as being the same gun the Defendant was arrested with.

N.T. 02/13/13, pp. 10-11.

acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa. R. Evid. 404(b)(1). Nonetheless, such evidence "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Pa. R. Evid. 404(b)(2). Furthermore, Pennsylvania Rule of Evidence 404(b) "is not limited to evidence of crimes that have been proven beyond a reasonable doubt in court. It encompasses both prior crimes and prior wrongs and acts, the latter of which, by their nature, often lack 'definitive proof.' " *Commonwealth v. Lockcuff*, 813 A.2d 857, 861 (Pa. Super. 2002) (emphasis omitted).

This court did not err in admitting Mr. Rigney's testimony concerning defendant's prior possession of a handgun. In *Commonwealth v. Edwards*, 762 A.2d 382 (Pa. Super. 2000), the court noted that " '[t]he Commonwealth need not establish that a particular weapon was actually used in the commission of a crime in order for it to be introduced at trial. Rather, the Commonwealth need only show sufficient circumstances to justify an inference by the finder of fact that the particular weapon was likely to have been used in the commission of the crime charged.' " *Id.* at 386 (quoting *Commonwealth v. Spotz*, 552 Pa. 499, 522, 716 A.2d 580, 591 (1998)). Hence, the court held that "[a] weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence." *Commonwealth v. Williams*, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994). In *Commonwealth v. DeJesus*, 584 Pa. 29, 40-41, 880 A.2d 608, 615 (2005) (emphasis omitted), the court further explained that "[a]s with any other evidence, the question of admissibility depends to a large extent upon the purpose for which the evidence was proffered, as well as a balance of probative value and prejudicial effect. If evidence of possession of, or access to, a weapon other than the murder weapon were proffered for some other relevant purpose, no hard and fast rule could require its exclusion."

In this matter, Mr. Rigney's testimony was introduced for the purpose of establishing defendant's ready access to and familiarity with a handgun very similar to the handgun used in this murder. Mr. Rigney's testimony was also admitted to prove the identity of the perpetrator of the crime. *See, e.g., Commonwealth v. Evans*, 488 Pa. 38, 410 A.2d 1213 (1979) (ruling that trial court properly admitted evidence of defendant's participation in bank robbery several months

prior to murder because gun stolen from bank's security guard was same gun used as murder weapon, thereby proving defendant's identity). This evidence was also offered to assist the jury in determining defendant's state of mind, knowledge, awareness and intent at the time of the homicide as well as whether or not defendant acted with malice. *See Commonwealth v. Rose*, 483 Pa. 382, 396 A.2d 1221 (1979) (stating that there is a general concession that the probative value outweighs any prejudice to defendant when the other crimes evidence is relevant and important to one of the enumerated exceptions above).

This evidence was not admitted for the impermissible purpose of showing that defendant was a person of bad character or that he had criminal tendencies. *See Commonwealth v. Cousar*, 593 Pa. 204, 225, 928 A.2d 1025, 1037 (2007) (explaining that "proofs concerning distinct crimes is inadmissible solely to demonstrate a defendant's bad character or his propensity to commit crimes"). Before admitting this evidence, this court determined that the probative value outweighed any prejudicial effect it may have had on defendant. *See Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa. Super. 2007) (reaffirming holding in *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa. Super. 2004), that "[b]ecause all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case"). Moreover, any potential prejudice that may have inured to defendant was cured by this court's cautionary jury instruction.[5] *See Commonwealth v. Claypool*, 508 Pa. 198, 206, 495 A.2d

---

[5] This court provided the following instruction to the jury:

> There was also evidence introduced regarding the Defendant's alleged possession of a .38 caliber revolver on August 12, 2011. Generally speaking, evidence regarding a Defendant's possible involvement in another unrelated crime is not admissible at trial; however, such evidence is admissible if it is offered for a legitimate reason such as to assist the jury in determining other trial issues and, therefore, may be considered by you for this limited purpose.

> You may consider the evidence regarding the Defendant's alleged possession of a .38 caliber revolver on August 12, 2011 to assist you in determining the Defendant's state of mind, knowledge, awareness and intent at the time of the homicide in this case, as well as whether or not the Defendant acted with malice.

> You may also consider this evidence on the issue of whether the Defendant had access to, and knowledge of, and familiarity with a particular gun, to wit, a .38 caliber revolver which may, if you so choose to find, show that the Defendant had both the means and the ability to commit the homicide in this case and, therefore, may be probative of the Defendant's identity as the person

176, 179 (1985) (holding that "such evidence must be accompanied by a cautionary instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted"). Therefore, defendant's contention has no merit.

Defendant next contends that this court erred by not severing his case arising from the arrest on September 20, 2011, when police recovered a revolver from him. This issue is deemed waived because the record does not show that defendant made a timely objection or motion seeking the severance of that case. Pennsylvania Rule of Evidence 103(a)(1) provides that "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless ... a timely objection, motion to strike or motion in limine appears of record...." *See also* Pa. R. App. P. 302(a) (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); *Commonwealth v. Montalvo*, 641 A.2d 1176, 1184 (Pa. Super. 1994) (emphasizing that the appellate court "will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected").

Even if this issue has not been waived, there was no error in consolidating the two cases. In *Commonwealth v. Brown*, 323 A.2d 223, 224 (Pa. Super. 1974), the court held that "[t]he grant or denial of severance is a matter of the discretion of the trial court whose conclusion will be reversed only for manifest abuse of discretion or prejudice or clear injustice to the defendant." An abuse of discretion has not occurred " 'if the facts and elements of the two crimes are easily separable in the minds of the jurors and if the crimes are such that the fact of commission of each crime would be admissible as evidence in a separate trial for the other.' " *Commonwealth v. Galloway*, 495 Pa. 535, 539, 434 A.2d 1220, 1221-1222 (1981) (quoting *Commonwealth v. Taylor*, 393 A.2d 929, 933 (Pa. Super. 1978). The facts and issues were not so complex as to prevent the jury from considering each case separately. Additionally, each case would have been admissible evidence in a separate trial for the other case because it proves the identity of the perpetrator and shows the natural development of the facts and the sequence of events surrounding this murder. *See Evans* (holding that other crimes evidence admissible to prove defendant's identity); *Commonwealth v. Billa*, 521 Pa. 168, 177, 555 A.2d 835, 840 (1989)

---

who committed the crimes charged. You may not, however, consider this evidence as tending to show that the Defendant is a person of bad character or has criminal propensities from which you could infer that he committed the crimes charged in this case.

N.T. 09/19/13, pp. 200-202.

(listing situation "where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development" as an exception to rule prohibiting other bad acts or crimes). Consequently, there was no error in consolidating these two cases into one trial.

Defendant contends that this court erred in admitting a photograph of decedent, alleging that it was inflammatory. The "admissibility of photographs falls within the discretion of the trial court and only an abuse of that discretion will constitute reversible error." *Commonwealth v. Malloy*, 579 Pa. 425, 440, 856 A.2d 767, 776 (2004)). In *Commonwealth v. Mollett*, 5 A.3d 291 (Pa. Super. 2010), the court reiterated that "[p]hotographs of a murder victim are not per se inadmissible[.]" *Id.* at 301 (quoting *Commonwealth v. Tharp*, 574 Pa. 202, 222, 830 A.2d 519, 531 (2003)). Indeed, "[m]urder evidence is not often agreeable, but sanguinity does not equal inadmissibility." *Commonwealth v. Spell*, 28 A.3d 1274, 1279 (Pa. 2011). Instead, our Supreme Court has directed that:

> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>
> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Johnson*, 615 Pa. 354, 383-384, 42 A.3d 1017, 1033-1034 (2012) (quoting *Commonwealth v. Pruitt*, 597 Pa. 307, 327, 951 A.2d 307, 319 (2008)).

In this matter, the photograph was unpleasant, but it was not so inflammatory as to preclude the jury from viewing it. As the court ruled in *Commonwealth v. Marinelli*, 547 Pa. 294, 321, 690 A.2d 203, 217 (1997), "[w]hile the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory." In *Commonwealth v. Solano*, 588 Pa. 716, 736, 906 A.2d 1180, 1192 (2006), the court further explained that "[e]ven gruesome or potentially inflammatory photographs are admissible when the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the

minds and passions of the jurors." This photograph was relevant in showing the conditions of the crime scene and in aiding the jury's understanding of the witnesses' testimony. *See, e.g.,* *Commonwealth v. Kendricks,* 30 A.3d 499 (Pa. Super. 2011) (concluding that color photographs taken at decedent's autopsy were relevant to enhance jury's understanding of the facts). Furthermore, this court provided a curative instruction to diminish any prejudice that may have been caused by the introduction of this evidence. *See* N.T. 02/12/13, pp. 166-167; *Commonwealth v. Pruitt,* 597 Pa. 307, 328, 951 A.2d 307, 319 (2008) (holding that "[a]lthough the possibility of inflaming the passions of the jury is not to be lightly dismissed, a trial judge can minimize this danger with an appropriate instruction, warning the jury members not to be swayed emotionally by the disturbing images, but to view them only for their evidentiary value").[6] Therefore, there was no error in admitting this photograph into evidence.

Defendant alleges that this court erred in denying his motion to suppress the statement he made to police subsequent to his arrest.[7] When reviewing a challenge to the suppression court's ruling, the appellate court is bound by the suppression court's findings of fact so long as they are supported by the record. *Commonwealth v. Chandler,* 505 Pa. 113, 477 A.2d 851 (1984). The

---

[6] The court instructed the jury as follows:

> Ladies and gentlemen, photograph number 12 is admitted into evidence for the purpose of showing the conditions of the scene of the alleged crime and to have you understand the testimony of the witnesses. It is not a pleasant photograph to look at. You should not stir up your emotions or prejudice the Defendant. Your verdict must be based on a rational and fair consideration of all the evidence and not on passion or prejudice against the Defendant, the Commonwealth or anyone else connected to this case.

N.T. 02/12/13, pp. 166-167.

[7] Defendant provided the following statement to the detective:

> I was arguing with my girl that night and I was drinking E&J at the house. I left my girl and went to the Eagle Bar and I was drinking shots, getting fucked up. I was drinking Gray Goose, 151 and Henny. I left the bar around closing and I was just walking around, that's when I seen the girl, Me-Me. I've been fronting her coke for a couple months now and she keeps coming up short with my money. I asked her where my money was and she gave me rabbit ears, like she was saying she didn't have any for me. Rabbit ears is like when someone is broke and they don't have any money. She was all disrespectful, like saying she don't have shit for me and that is when I got pissed and put the gun to her head. I was putting it right up against her head to scare her and it went off. She dropped right there and I ran away. I didn't mean to shoot. I was scared.

N.T. 02/15/13, pp. 23-24.

*Commw. v. Richard Mitchell*                    Page 25 of 39

appellate court will reverse this court's decision "only if there is an error in the legal conclusions drawn from those findings." *Commonwealth v. Basking*, 970 A.2d 1181, 1187 (Pa. Super. 2009) (quoting *Commonwealth v. Hill*, 874 A.2d 1214, 1216 (Pa. Super. 2005)). Thus, the appellate court must consider "whether the suppression court properly applied the law to the facts of the case." *Commonwealth v. Ruey*, 586 Pa. 230, 240, 892 A.2d 802, 807 (2006). In cases where the defendant's motion to suppress has been denied, the appellate court will " 'consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' " *In re J.V.*, 762 A.2d 376, 379 (Pa. Super. 2000) (quoting *Commonwealth v. Reddix*, 513 A.2d 1041, 1042 (Pa. Super. 1986)). Our Superior Court has held that "it is the sole province of the suppression court to weigh the credibility of the witnesses. .... Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." *Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. 1995) (citation omitted). It is the Commonwealth's burden to prove by a preponderance of the evidence that the evidence challenged by a defendant in his motion to suppress is admissible. *See Basking*.

In this case, defendant claims that there was no valid waiver of his rights set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), because he did not sign the appropriate form. Contrary to defendant's interpretation, there is no legal requirement that a specific form be used to effectuate the valid waiver of his *Miranda* rights. In *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995), the court ruled that "[a]ll that is necessary for a valid waiver is that appellant's rights be reasonably conveyed to him." *Id.*, 541 Pa. at 556, 664 A.2d at 1322 (abrogated on other grounds by *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003)). In *Miranda*, the United States Supreme Court outlined the following measures to protect an individual's constitutional rights:

> [A defendant] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may

knowingly and intelligently waive these rights and agree to answer questions or make a statement.

*Id.*, 384 U.S. at 479. In *Duckworth v. Eagan*, 492 U.S. 195 (1989), the court further instructed:

> We have never insisted that *Miranda* warnings be given in the exact form described in that decision. .... In *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam), we stated that 'the rigidity of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' and that 'no talismanic incantation [is] required to satisfy its strictures.' *Id.*, at 359, 101 S. Ct., at 2809.

> *Miranda* has not been limited to station house questioning, ... and the officer in the field may not always have access to printed *Miranda* warnings, or he may inadvertently depart from routine practice, particularly if a suspect requests an elaboration of the warnings. The prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed. 2d 182 (1974). Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' *Prysock*, supra; 453 U.S., at 361, 101 S.Ct., at 2810.

*Duckworth*, 492 U.S. at 202-203. As required by *Miranda*, the detective reasonably conveyed to defendant the nature of his constitutional rights. Defendant was advised that he had the right to remain silent, that anything he said could and would be used against him in court, that he had the right to talk to a lawyer of his own choosing before questioning, that he had the right to have a lawyer present during questioning, and that an attorney would be appointed if he wished to have and could not afford one. Indeed, defendant was advised of his *Miranda* rights twice. The first time he received them verbally. On the second time, defendant was advised in writing. These rights were listed within letters A to E on the first page of a form containing the statement that defendant subsequently provided to Detective Dove. The following is a verbatim recitation of the *Miranda* rights delineated on that page:

> We have a duty to explain to you and to warn you that you have the following legal rights:

A. You have a right to remain silent and do not have to say anything at all.
B. Anything you say can and will be used against you in Court.
C. You have aright [sic] to talk to a lawyer of your own choice before we ask you any question, and also to have a lawyer here with you while we ask questions.
D. If you connot [sic] afford to hire a lawyer, and you want one, we will see that you have a lawyer provided to you, free of charge, before we ask you any questions.
E. If you are willing to give us a statement, you have a right to stop any time you wish.

The content of this form was read to defendant, who had the opportunity to review this page before he placed his signature at the bottom. These facts clearly establish that defendant's *Miranda* rights were reasonably conveyed to him.

After being properly advised, defendant waived his *Miranda* rights voluntarily, knowingly, and intelligently. In making this determination, the court engaged in a two-fold inquiry:

> First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Commonwealth v. Rushing*, 71 A.3d 939, 949 (Pa. Super. 2013) (quoting *In re T.B.*, 11 A.3d 500, 505 (Pa. Super. 2010)). Here, there is no evidence that defendant was intimidated, coerced or deceived into waiving his *Miranda* rights. To the contrary, defendant's conduct indicated his willingness to provide a statement to the detective. After being twice advised of his *Miranda* rights, defendant signed and dated the first page of his statement to memorialize his waiver. It was only at the end of the interview when defendant invoked his right to have an attorney present. At that moment, all questioning ceased, thereby exhibiting the legitimacy of defendant's preferences.[8] Consequently, defendant's waiver was the product of his free and deliberate

---

[8] At the end of defendant's interview, the following exchange occurred:

> [Detective]: I'm going to have Det. Fetters read this interview back to you. If you are satisfied that everything is true and correct, sign the bottom of each page.

choice. When defendant made this choice, he was fully aware of and responsive to his surroundings. He was not under the influence of drugs or alcohol. He also understood the nature of his rights and the consequences of invoking or waiving these rights.[9] Defendant's knowledge of these rights was further supported by his prior experience with law enforcement. *See Miller*, 541 Pa. at 556, 664 A.2d at 1322 (holding that "prior experience with *Miranda* warnings suggests waiver is knowing and voluntary"). In addition to being voluntary, defendant's waiver was knowingly and intelligently made. Therefore, defendant's motion to suppress his statement was properly denied.

Defendant's next challenge is that this court erred in denying his motion to suppress the gun that police seized during his arrest. Defendant argues that police had no reasonable suspicion to detain him and no probable cause to arrest him and seize his gun. Indeed, defendant's initial contact with police was a mere encounter, which is a lawful interaction between a police officer and a citizen. *See Commonwealth v. Boswell*, 554 Pa. 275, 284, 721 A.2d 336, 340 (1998) (explaining that "[p]olice may engage in a mere encounter absent any suspicion of criminal activity"). Notwithstanding this mere encounter, defendant's subsequent

---

[Defendant]:    I heard everything he read back to me and that's what I told you today but I ain't signing anymore without my lawyer.

Commonwealth Exhibit 18, p. 5.

[9] At the beginning of defendant's interview, the following exchange occurred:

[Detective]:    Several minutes ago I went over your constitutional warnings with you about your right to remain silent and have a lawyer. Do you remember?

[Defendant]:    Yes.

[Detective]:    Did you understand everything that we went over?

[Defendant]:    Yes.

[Detective]:    Do you have any questions for me?

[Defendant]:    No.

[Detective]:    Richard, do you understand that you are under arrest for the murder of Shari Harris which occurred on 9.10.11 at 13th and Rising Sun Avenue?

[Defendant]:    Yes.

[Detective]:    Would you like to make a statement regarding this murder?

[Defendant]:    Yes.

Commonwealth Exhibit 18, pp. 2-3.

*Commw. v. Richard Mitchell*                    Page 29 of 39

conduct yielded circumstances that gave rise to reasonable suspicion to detain defendant for further investigation.

Certainly, "a police officer may, short of an arrest, conduct an investigative detention if he has a reasonable suspicion, based upon specific and articulable facts, that criminality is afoot." *Commonwealth v. Zhahir*, 561 Pa. 545, 552, 751 A.2d 1153, 1156 (2000)). The court "must give 'due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.' " *Commonwealth v. Rogers*, 578 Pa. 127, 134, 849 A.2d 1185, 1189 (2004) (quoting *Commonwealth v. Cook*, 558 Pa. 50, 57, 735 A.2d 673, 676 (1999)). In analyzing whether there was reasonable suspicion, the court must be mindful that "the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, 'even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.' " *Id.*

In this case, the police officers had reasonable suspicion to detain defendant. In *Commonwealth v. Powell*, 934 A.2d 721 (Pa. Super. 2007), the court ruled that:

> Even if probable cause to arrest is absent, the police officer may still legitimately seize a person, and conduct a limited search of the individual's outer clothing in an attempt to discover the presence of weapons which might be used to endanger the safety of the police officer and others, if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to conclude that criminal activity may be afoot and that the person with whom he is dealing may be armed and dangerous.

*Id.* at 723-724 (quoting *Commonwealth v. Rodriguez*, 532 Pa. 62, 73-74, 614 A.2d 1378, 1383-1384 (1992)). The record shows that on September 20, 2011, Officers Diaz and Hernandez were working in burglary detail as plain clothed officers when they were directed to search for a black male wearing a red hat, black jacket, and Timberland boots at the intersection of Germantown Avenue and Tioga Street. As a result, they began to travel southbound on the 3400 block of Germantown Avenue. En route to that intersection, police encountered defendant, who matched this description, walking northbound with an unidentified female. When they reached the intersection, they saw no one who matched the description. As a result, they made a U-turn and began to travel northbound toward the same direction as defendant. When they approached

defendant, they identified themselves as police officers and asked if they could talk to him. Before they could say anything else, defendant grabbed the right side of his waistband and began to run westbound. *See Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. 1991) (holding that "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed").

Based on his experience and training, Officer Diaz recognized defendant's action as an indicator that he was in possession of a handgun. *See Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa. Super. 2009) (ruling that "if a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search"). At that point, police reasonably concluded that defendant may be armed and dangerous. Furthermore, there was no other reason for defendant to run away from the police officers, other than to conceal his criminal conduct. As the court held in *Commonwealth v. Brown*, 904 A.2d 925, 928 (Pa. Super. 2006), "unprovoked flight in a high crime area [is] sufficient to create a reasonable suspicion to justify a *Terry* stop under both federal and state principles." Accordingly, defendant's reaction in a high crime area gave police reasonable suspicion to believe that criminal activity was afoot. Thus, the police officers were lawfully permitted to detain defendant for further investigation.

Before this lawful detention could occur, the situation escalated and gave rise to probable cause to arrest defendant. Probable cause is a " 'fluid concept – turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules.' " *Commonwealth v. Ruey*, 586 Pa. 230, 253, 892 A.2d 802, 815 (2006) (quoting *Commonwealth v. Glass*, 562 Pa. 187, 201, 754 A.2d 655, 663 (2000)). This concept is "based on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Commonwealth v. Gray*, 509 Pa. 476, 483, 503 A.2d 921, 925 (1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). In *Commonwealth v. Rodriguez*, 526 Pa. 268, 273, 585 A.2d 988, 990 (1991), the court further instructed that "[t]he bench mark of a warrantless arrest is the existence of probable cause, namely, whether the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of

which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime."

In the instant case, defendant's conduct led police to reasonably believe that he illegally possessed a handgun when he continued to flee the scene and hold onto his waistband after the police officers indicated their intent to detain him. Defendant ran into an alleyway where he began to discard his clothing. In pursuit of defendant, a police officer observed defendant's gun fall from his person, fly into the air, and land onto the ground. Based on the totality of these circumstances, there was probable cause to arrest defendant. *See, e.g., Commonwealth v. Hall*, 929 A.2d 1202, 1208 (Pa. Super. 2007) (citing *Commonwealth v. Stevenson*, 894 A.2d 759, 775 (Pa. Super. 2006), for the proposition that "probable cause for an arrest occurs when, immediately after the police indicate to the suspect their intent to conduct an investigatory stop because they observed the outline of a concealed handgun, the suspect physically resists the officers' efforts while maintaining possession of the firearm). Aside from these facts, there was an outstanding warrant for defendant's arrest in another case. Consequently, the police officers had lawful authority to detain and arrest defendant notwithstanding the above stated circumstances.

After his arrest, police officers lawfully seized defendant's .38 Colt handgun with a handle wrapped in electrical tape. *See Commonwealth v. Wright*, 560 Pa. 34, 42, 742 A.2d 661, 665 (1999) (quoting *Shipley v. California*, 395 U.S. 818, 819 (1969), which held that "[a] warrantless search incident to an arrest is valid 'only if it is substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest' "); *Commonwealth v. Ingram*, 814 A.2d 264, 272 (Pa. Super. 2002) (repeating principle "that a warrantless search incident to a lawful arrest is reasonable, and no justification other than that required for the arrest itself is necessary to conduct such a search"). They also recovered the discarded clothing in the alleyway. Accordingly, this court did not err in denying defendant's motion to suppress this lawfully seized handgun.

Defendant next requests a new trial because the prosecutor allegedly committed misconduct by making three different statements during her closing argument. In *Commonwealth v. Boxley*, 575 Pa. 611, 623, 838 A.2d 608, 615 (2003), the court held that "[t]he decision to grant or deny a motion for mistrial is within the sound discretion of the trial court." In *Commonwealth v. Faulkner*, 528 Pa. 57, 77, 595 A.2d 28, 39 (1991), the court explained that:

"Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial." *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973). Rather, the focus is on what, if any, effects the comments had on the jury. A new trial is required when the effect of the [Assistant] District Attorney's comments "would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Van Cliff*, 483 Pa. 576, 582, 397 A.2d 1173, 1176 (1979), *cert. denied*, 441 U.S. 964, 99 S.Ct. 2412, 60 L.Ed.2d 1070 (1979), quoting *Commonwealth v. McNeal*, 456 Pa. 394, 400, 319 A.2d 669, 673 (1974).

Certainly, a prosecutor is prohibited from expressing "a personal belief regarding the defendant's guilt or innocence or the veracity of the defendant or the credibility of his witnesses." *Commonwealth v. Novasak*, 606 A.2d 477, 481 (Pa. Super. 1992). During closing argument, the prosecution is "limited to making comments based upon the evidence and fair deductions and inferences therefrom." *Commonwealth v. Joyner*, 469 Pa. 333, 340, 365 A.2d 1233, 1236 (1976). Nevertheless, "the prosecutor is permitted to respond to defense arguments and is free to present his or her case with logical force and vigor." *Commonwealth v. Koehler*, 558 Pa. 334, 363, 737 A.2d 225, 240 (1999). In reviewing a prosecutor's remark, our Superior Court has cautioned that a defendant's conviction " 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statement or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.' " *Novasak*, 606 A.2d at 480 (quoting *Commonwealth v. Green*, 525 Pa. 424, 460, 581 A.2d 544, 561-562 (1990)). Accordingly, a new trial will be granted only if the unavoidable effect of the prosecutor's comments prevented the jury from fairly and objectively considering the evidence. *See Commonwealth v. Ogrod*, 576 Pa. 412, 839 A.2d 294 (2003).

Here, the prosecutor's closing remarks did not prevent the jury from entering a fair and just verdict.[10] The prosecutor made the first two contested remarks to offset defense counsel's

---

[10] The following is a verbatim account of the assistant district attorney's remarks, which has been provided in the context within which the first two contested remarks were made:

> [Assistant District Attorney]: Now, I am going to have to show you, since Counsel brought it up, the pictures of her body because where she is found and how she is found is evidence for you.

attempt to highlight an irrelevant fact that had no bearing on the essential issues in this case.[11]
*See Commonwealth v. Middleton*, 409 A.2d 41, 44 (Pa. Super. 1979) (opining that "[p]rosecuting

---

....

Now, Counsel talks to you about this idea about the condom in her and you take a look at the positioning of her body. Her skirt is still perfectly in place. Her clothes aren't disturbed.

Now, we will move on to lighting but that is just to get the picture of the screen. So when Counsel tells you and talks to you over and over again about a condom in her, first of all, it was preserved. If the Defense wanted to test it, it is available for anyone to test it.

[Defense Counsel]: Objection.

[THE COURT]: Sustained.
Go on.

[Assistant District Attorney]: Second of all, with regard to that, you heard from the medical examiner that the condom that was in her could have been there for up to two days, that there is no sign of infection but it doesn't mean that it was there immediately beforehand and, in fact, the position of her body and the position of her hand suggests that she, in fact, was not having sex right beforehand. That is a red herring, and for anyone else to stand up here and to tell you, oh, well, just because she had a condom in her, that must be someone who did it. That is ridiculous. There are no signs of sexual trauma. This is not about that.

She is a young lady who, as you heard, had a lot of drugs in her system. So is it possible that she didn't know that was in her? Of course. Does it have anything to do with her death? No. That's just a disgusting detail to, again, try to besmirch or smear this young woman who didn't do anything wrong.

[Defense Counsel]: Objection, move for a mistrial.

[THE COURT]: Denied.
Overruled.

[Assistant District Attorney]: So, let's take a look at the actual evidence that you have in front of you, not speculation, not supposition but the hard evidence.

N.T. 02/19/13, pp. 132-134.

[11] Defense counsel stated the following:

Going on, as we start to get toward the end of last week, we had the Medical Examiner, if I recall, Dr. Samuel Gulino who did the examination, who indicated the victim died of one gunshot wound, I forget which side, went right through the head. There was no bullet or projectile found or located.

Significant in his testimony, if you recall, was that the fact that he took her personal effects, his office did, but he couldn't remember what they were.

attorneys must attempt to meet extravagant, emotional and even distorted arguments of defense counsel in a manner consistent with responsibility as a public prosecutor"); *Commonwealth v. Trivigno*, 561 Pa. 232, 244, 750 A.2d 243, 249 (2000) (holding that "[a] remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel"). Thus, the prosecutor's remarks were not improperly made. Likewise, the prosecutor's third contested remark did not unduly prejudice defendant.[12] Contrary to

---

Remember, there was some suggestion what was taken, what was not taken. He was not able to tell us but apparently there were personal effects on her that weren't taken in this particular matter and also of significance was the fact that there was a condom in her and that he did swabs from that condom but no one ever asked to have it tested, so we don't know if there was some third party near her, by her shortly before her demise, according to DNA testing in this particular matter.

. . . .

. . . . The things they take from the scene, no one tested them. The DNA, no one tested them. Then we have Dr. Gulino and the condom, no one tested it.

Because what really happened here? Again, I don't know. I wasn't there. Believe me I am not coming forth as your secret eyewitness. This isn't Perry Mason where I will break down witnesses and say I saw it. By the way, here is what it is. What really happened here?

I would suggest by the evidence that it didn't happen either way the Commonwealth is suggesting in terms of my client's involvement but we do know some objective things. We know, unfortunately, that the victim, Miss Harris, was a drug user and I hate to talk bad about the dead but was a prostitute. We heard from some of the witnesses she does tricks and things of that nature. We also know in her vagina, which was discovered by Dr. Gulino, actually part of it was cut when he was examining her, was a condom and we also know in her hand when she was found, there was crack/cocaine.

N.T. 02/19/13, pp. 72-73, 111-112

[12] The following is a verbatim account of the assistant district attorney's remarks, which has been provided in the context within which the third contested remark was made:

[Assistant District Attorney]: What you have, ladies and gentlemen, is overwhelming evidence of every type. The Defense has asked you to pick it apart if you don't like this piece or don't like this piece but you look at it all together. All together, from the very beginning, each of these witnesses has only named or described one person, Richard Mitchell. They described that before we ever arrested him with the gun, before we ever arrested him with the gun, before we ever saw what he looked like, before we got to this point.

Reasonable doubt has to be real doubt. It can't be imagined to avoid carrying out an unpleasant duty. It is unpleasant to know that the Defendant took that revolver, put it to her head and blew her away. That's unpleasant but

defendant's characterization of this remark, it was not an expression of the prosecutor's personal belief regarding the defendant's guilt or innocence or on the veracity of any of the witnesses. Instead, the prosecutor's remark reminded the jury of its duty "to weigh the evidence and resolve conflicts therein." *Commonwealth v. Story*, 476 Pa. 391, 415, 383 A.2d 155, 167 (1978). *See also Commonwealth v. Patton*, 604 Pa. 307, 316, 985 A.2d 1283, 1288 (2009) (holding that prosecutor did not commit misconduct by stating during closing statements that jury took an oath "to listen to the facts, to apply the law to the facts and render a verdict" because it was not a misstatement of jury's duty "to find facts and apply the law to them"); *Commonwealth v. Carson*, 590 Pa. 501, 584, 913 A.2d 220, 269 (2006) (noting that in *Commonwealth v. Rollins*, 558 Pa. 532, 558, 738 A.2d 435, 450 (1999), the court "found no error where the prosecutor asked the jury to 'live up to' the promise it made under oath to follow the law"); *Commonwealth v. Peterkin*, 511 Pa. 299, 321, 513 A.2d 373, 384 (1986) (recognizing that "[t]he Commonwealth has a legitimate interest in obtaining a jury that will abide by the jurors' oath and apply the law to the facts"). When the prosecutor's closing argument is read in context, it is clear that there was no error in making such a comment. *See Commonwealth v. Correa*, 664 A.2d 607, 609 (Pa. Super. 1995) (quoting *Commonwealth v. Jubilee*, 589 A.2d 1112, 1114 (Pa. Super. 1991), which directs that "comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made"). Thus, defendant's claim has no merit.

Defendant's final contention is that this court erred in providing a jury instruction that was different from the one that he anticipated.[13] During the testimony of Lathan Peterson, the

---

he did and nothing that you heard before you erases any of that or changes any of that.

> Ladies and gentlemen, you are about to go in the back after the Judge gives you his instructions and you have the power that I don't because for as much as I can bring the people in and introduce them to you and ask questions, as much as I can show you their statements, you are the ones that have the very powerful job of rendering a verdict. Verdict means to speak the truth and so I beg you speak the truth on behalf of Shari Harris, on behalf of Philadelphia and the truth is that the Defendant is guilty.

N.T. 02/19/13, pp. 173-175.

[13] After this court's closing instructions to the jury, the following exchange occurred:

[THE COURT]:     We are in the anteroom, outside the hearing of the jury. Mr. Stretton is here for the Defendant, Miss Kim for the Commonwealth.

jury heard about defendant's prior drug dealing. Immediately after this evidence was introduced, this court instructed the jury as follows:

> Ladies and gentlemen, you heard evidence tending to show that the Defendant engaged in conduct for which he is not on trial. I am speaking of the testimony you heard regarding hustling, selling. The evidence is before you for a very limited purpose, that is the purpose tending to show motive for this crime and to present the context within which this homicide is alleged to have occurred and to complete the story of the events surrounding this incident.

N.T. 02/12/13, pp. 244-245. Contrary to defendant's position, a nearly identical instruction was provided to the jury at the end of closing arguments, when this court stated the following:

> You also heard evidence tending to show that the Defendant engaged in conduct for which he is not on trial. I'm speaking of the testimony to the effect that the Defendant allegedly sold drugs. This evidence is before you for a limited purpose, that is, for the purpose of tending to show motive and to present the context within which this homicide is alleged to have occurred and to complete the story of the events surrounding this incident. This evidence must not be considered by you in any other way other than the purpose I just stated. You must not regard this evidence as showing that the Defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt in this case.

N.T. 02/19/13, pp. 199-200.

This court did not err in providing these instructions to the jury. Indeed, this court "has broad discretion in phrasing its charge and can choose its own wording so long as the law is

---

> This is your opportunity, Counsel, to object to the Court's charge and all or part to request corrections, to request additional instructions, to make any comment of any sort.
>
> Mr. Stretton?
>
> [Defense counsel]: I have one objection. On your instruction on the Defendant's prior drug use, remember that arose during Mr. Peterson's testimony, the statement about him grinding and what that means, that was to be introduced primarily for his opportunity --- how he knew the Defendant. In your instruction though, you noted that it went to the motive and other matters. That was different from your instructions you had given to the jury earlier.

N.T. 02/19/13, p. 227.

*Commw. v. Richard Mitchell*                    Page 37 of 39

clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error." *Commonwealth v. Jones*, 542 Pa. 464, 517, 668 A.2d 491, 517 (1995). When evaluating the suitability of the trial court's jury instructions, those "instructions must be considered in the context of the overall charge; a single instruction may not be reviewed in isolation." *Commonwealth v. Einhorn*, 911 A.2d 960, 976 (Pa. Super. 2006).

There was no reversible error because this court properly instructed the jury on how to evaluate the contested evidence. As the court held in *Commonwealth v. Cox*, 546 Pa. 515, 530, 686 A.2d 1279, 1286 (1996), "[a] trial court is under a duty to instruct a jury on the correct legal principles applicable to the facts presented at trial." In this case, evidence of defendant's prior drug dealing was admitted for the limited purpose of showing motive. *See Commonwealth v. Murphy*, 613 A.2d 1215 (Pa. Super. 1992) (quoting *Commonwealth v. Ward*, 529 Pa. 506, 509, 605 A.2d 796, 797 (1992), which held that motive "is always relevant and admissible" even though it may not be an essential element of crime); *Commonwealth v. Rogers*, 615 A.2d 55, 58 (Pa. Super. 1992) (ruling that "evidence of other crimes, even those involving drug-related activities is admissible to demonstrate motive").

This evidence was also admitted for the limited purpose of presenting the complete story of events surrounding the incident to assist the jury in understanding the context within which this homicide occurred. *See Commonwealth v. Lark*, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988) (recognizing that "evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place"). In *Lark*, our Supreme Court declared that the trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged[.]" *Id.*, 518 Pa. at 310, 543 A.2d at 501. These were permissible grounds upon which this evidence was introduced to the jury. Consequently, this court adequately, accurately and clearly instructed the jury on the applicable law. *See Commonwealth v. Funke*, 452 A.2d 857, 862 (Pa. Super. 1982) (quoting *Commonwealth v. Zeger*, 186 A.2d 922, 925 (Pa. Super. 1962), stating that "[o]ne of the duties of a trial judge is 'to clarify the issues so that the jury may comprehend the questions they are to decide' "). Thus, there was no error in providing this jury instruction.

Therefore, in light of the foregoing, the judgment of sentence should be AFFIRMED.

BY THE COURT,

Sandy L.V. Byrd,    J.